# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

```
-------------------------------------------------
In re:

Stinar HG, Inc. d/b/a Stinar Corporation


-------------------------------------------------
```

Bankruptcy No. 17-31670
Chapter 11 Case


Debtor.

---

## NOTICE OF HEARING AND MOTION FOR APPROVAL OF POST-PETITION DEBTOR IN POSSESSION FINANCING AGREEMENT INCLUDING PROVISION OF SECURITY INTERESTS SUPERPRIORITY STATUS AND ADMINISTRATIVE EXPENSE TREATMENT AND FOR EXPEDITED AND LIMITED NOTICE

---

TO ALL PARTIES IN INTEREST AND OTHER ENTITIES AS SPECIFIED IN LOCAL RULE 9013-3:

1.      Stinar HG, Inc., d/b/a Stinar Corporation ("Debtor"), by and through its undersigned attorneys, moves the court for the relief requested and gives notice of hearing herewith.

2.      The court will hold an expedited hearing on this motion in Courtroom 8W, US Courthouse, 300 South Fourth Street, Minneapolis, Minnesota 55415 at 9:30 a.m., or as soon thereafter as counsel may be heard on the 25th day of May, 2017, before the Honorable Kathleen H. Sanberg, Chief Bankruptcy Judge. THE HEARING ON THIS MOTION MAY BE CONTINUED BY THE COURT, AT THE HEARING, WITHOUT FURTHER NOTICE TO ANY PARTY.

3.     Based on the short amount of notice provided, any response to the hearing must be filed and delivered not later than the date and time of the hearing. IF OBJECTIONS ARE NOT SERVED AND FILED IN A TIMELY MANNER, THE COURT MAY GRANT THE REQUESTED RELIEF WITHOUT A HEARING IN ACCORDANCE WITH LOCAL RULE 9013-2(f).

4.     The petition commencing this Chapter 11 case was filed on May 22, 2017 (the "Filing Date"), and the case is now pending before this court.

5.     This court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334, Bankruptcy Rule 4001, 5005, and Part IX of the Local Rules. This motion is filed under Bankruptcy Rule 4001(b), (c), and (d), 9014, and Local Rule 4001-2.  This proceeding arises under 11 U.S.C. §§ 363, 364, and 365.

6.     The Debtor has sought financing on an unsecured basis and a secured basis and to date has been unable to obtain credit without providing superpriority status to the lender under Section 364(c) of the Bankruptcy Code.

7.     Movant requests the following relief:

(a)   For an order granting Debtor the right to enter into post-petition Debtor in possession secured financing Agreement ("DIP Lending Agreement"), pursuant to the terms of a DIP Lending Agreement, security agreement and related documents with Kruckeberg Industries, LLC. whose terms are summarized as follows:

| Maximum | $325,000.00 |
|---------|-------------|

2

| Term: | Varies, see agreement 1, dd, Page 3 |
|---|---|
| Minimum | $100,000.00. |

**Formula Used to determine advances:** Adherence to Budget with no more than 25% variance, also no defaults, achievement of various milestones set forth in paragraph 21 of the agreement

**Commitment Fee** N/A

**Interest and Other Fees:** Interest base rate 4.5%; default rate 10%; Secured Creditor's attorney's fees

**Expenses:** Secured Creditor's reasonable fees, costs and expenses

**Security** Kruckeberg will receive a superpriority secured position on all real and personal assets of the Debtor in a priority as determined under state law in conjunction with the U.S. Bankruptcy Code. The prepetition liens and mortgages of Security Bank, the Small Business Administration, Ford Motor Credit and Kruckeberg are prior permitted liens.

(b)  Debtor further requests that the court allow the following terms to be included in the order allowing the Post-Petition Financing:

1.  The Debtor is authorized, effective immediately to execute all documents and take all actions to be executed and taken in connection with and in furtherance of all undertakings and obligations thereunder.

2.     The Debtor is authorized and empowered to incur secured indebtedness to Secured Party pursuant to this Order and the Post-Petition Agreement in such amounts as needed in the ordinary course of its business and not for any purpose prohibited by law. Debtor's use of the proceeds of such indebtedness shall not affect the rights of Secured Party hereunder.

3.     Secured Party and Debtor may amend, modify, supplement, waive the provisions of and/or extend the term of the agreements contemplated herein without further order of the Court provided that same does not materially alter the provisions thereof.

4.     Pursuant to Section 364(c)(2) and 364(d)(1) of the Bankruptcy Code, the Debtors may grant to Secured Party a security interest in the collateral as set forth in the Post-Petition Agreement effective as of the date of the filing of the Bankruptcy Case ("Collateral") as collateral for all future obligations of the Debtor to Secured Party incurred in connection with the negotiation documentation, closing and enforcement of the Post-Petition Agreement and the protection of Secured Party's rights in this Bankruptcy Case (the "Obligations").   The security interest shall be senior to all other liens except those for unassailable validly perfected pre-petition liens, including the Prior Permitted Liens as that term is defined in the DIP Lending Agreement.

5.     The Obligations shall constitute a superpriority administrative expense claim under Section 364(c)(l) of the Bankruptcy Code, which shall be deemed allowed, without any further filing by Secured Party, and which shall have priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code.

6.     The liens granted to Secured Party herein are deemed validly granted, duly attached, and properly perfected, without the need of any additional actions being taken by or on behalf of Secured

Party, including but not limited to, the filing or recording of Uniform Commercial Code financing statements and mortgages; provided, however, that in the event Secured Party does make such a filing or recordation, the Debtor shall execute all documents required by Secured Party to do so.

7.  Secured Party is hereby afforded the protection of Section 364(e) of the Bankruptcy Code with regard to the reversal or modification on appeal of this Order, or to the modification, vacating, or other amendment of this Order by this Court.

8.  The Debtor shall comply with all provisions of the Post-Petition Agreement.

9.  To the extent that any provision of the Post-Petition Agreement shall cause the Debtor to be in default thereunder solely as a result of it being subject to the Bankruptcy Code or it being insolvent, said provisions are waived by Secured Party.

10. The Debtor shall not grant to any party any interest in the Collateral or priority in payment prior to or equal with the lien, other than the Prior Permitted Liens, or priority in payment hereby being accorded to Secured Party.

11. The entry of this Order and execution, delivery, and performance under the Post-Petition Agreement, or under any other documents executed in connection therewith, do not constitute a compromise, waiver, or other relinquishment of any right of Secured Party at law, in equity or otherwise, including, but not limited to, any right of Secured Party to request and to obtain relief under the Bankruptcy Code.

12. The Debtor will not seek to surcharge the Secured Party or its collateral with any expenses of the type described in Section 506(c) or 552(b) of the Bankruptcy Code unless it obtained Secured Party's prior written consent to the incurrence of such expenses.

13. The Post-Petition Agreement is enforceable according to its terms and nothing contained therein is unlawful, unenforceable or violative of any usury or similar statute.

14. An event of default under this Order ("Default") shall include the following:

   a. the Debtor's failure to perform or comply with any of the terms, conditions, or covenants of this Order;
   b. The Debtor's failure to perform or comply with any of the terms, conditions, or covenants of the Post-Petition Agreement;
   c. The termination of this Order by its own terms, operation of law or court order;
   d. The dismissal of this Bankruptcy Case;
   e. The appointment of a trustee under the Bankruptcy Code;
   f. The conversion of the Bankruptcy Case to a case under another chapter of the Bankruptcy Code;

15. Upon the occurrence of a Default, Secured Party shall provide the Debtor written notice of such Default to the Debtor and counsel for the Debtor.  If the Default is a type that is not curable under the terms of the Post-Petition Agreement, or is curable by the Debtor and the Debtor fails to cure the Default within five days after notice of default, Secured Party shall have the right to seek whatever relief it deems necessary on an expedited basis.  Debtor shall maintain all defenses in said hearing, including the right to prove that despite any default that the Secured Creditor still is adequately protected, other than defenses to Secured Creditor's request for expedited relief.

16. Notwithstanding anything to the contrary contained herein, the proceeds of any advance from Secured Party, shall not be used either: (a) in connection with the investigation, assertion, commencement, or continuation of any action or claim against Secured Party or (b) to object to or contest, or raise any defenses to the validity, perfection, priority, or enforceability of any rights or claims of the Secured Party.

17. This Order is without prejudice to Secured Party's rights to pursue any and all rights and remedies under the Bankruptcy Code, the Agreement, and any other applicable agreement or law, including without limitation to seek an injunction, and/or to object to applications for allowance and/or payment of

compensation of professionals employed by the Debtor or its estate.

(c)  For Relief under Bankr. R. Pro. 2002 limiting the recipients to be provided notice to those individuals and entities listed in Local Rule 9013-1 et. seq.; and

(d)  For such other and further relief as the court deems just and equitable.

8.    Pursuant to Local Rule 9013-2(c), the Debtor states that should testimony be necessary at any hearing on this matter, Debtor reserves the right to call the following witnesses:

(a)  Mr. Robert Harvey, President of the Debtor; and

(b)  Mr. Frank Niu, CPA, Controller for the Debtors.

9.    This motion is further supported by a memorandum of law, attached hereto and incorporated herein.

WHEREFORE, Debtor prays for an order of the court as follows:

1.    Granting Debtor a hearing on an expedited basis based on limited notice;

2.    Authorizing the Debtor to enter into a post-petition Debtor in Possession secured financing agreement, pursuant to the terms of the DIP Lending Agreement, Security Interests, mortgages and related documents, the forms of which are attached hereto as Exhibits A; and

3.    For such other and further relief as the court may deem just and equitable.

Respectfully submitted,

Dated: May 22  2017

/E/   *Kenneth C. Edstrom*
Kenneth C. Edstrom (148696)
Sapientia Law Group
120 South Sixth Street, Suite 100
Minneapolis, MN  55415
612-756-7108
Kene@sapientialaw.com

***Proposed Attorneys for Debtor***

**EXHIBIT A (DIP LOAN AGREEMENT)**

## DEBTOR-IN-POSSESSION LOAN AGREEMENT

On this 22nd day of May 2017, Stinar HG, Inc., a Minnesota corporation ("**Borrower**"), and Kruckeberg Industries, LLC, a Delaware limited liability company ("**Lender**"), enter into this Debtor-in-Possession Loan Agreement (the "**Agreement**") as follows:

## RECITALS

WHEREAS, Borrower is the wholly-owned subsidiary of Oakridge Holdings, Inc., a Minnesota corporation ("**Shareholder**");

WHEREAS, Shareholder and Borrower each filed a Petition for Relief pursuant to Chapter 11 of Title 11 of the U.S. Code with the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**") on May 22, 2017 (the "**Petition Date**");

WHEREAS, Borrower continues to possess its assets and manage its business as a debtor-in-possession pursuant to 11 U.S.C. Sections 1107(a) and 1108;

WHEREAS, Borrower is indebted to Lender in the principal amount of Seventy Thousand and no/100 Dollars ($70,000.00), together with accrued and unpaid interest in the amount of One Thousand Two Hundred Seventy-Seven and 26/100 Dollars ($1,277.26) as of May 15, 2017, and interest accruing thereafter at the rate of Seventeen and 26/100 Dollars ($17.26) *per diem*, for amounts advanced to Borrower for the purchase of certain inventory (the "**Purchase Money Debt**") pursuant to that certain Secured Revolving Promissory Note dated as of February 14, 2017, between Borrower and Lender;

WHEREAS, Borrower requested that Lender provide certain loans to Borrower in the aggregate principal amount not to exceed Three Hundred Twenty-Five Thousand and no/100 Dollars ($325,000.00) for Borrower's short-term working capital needs;

WHEREAS, to secure repayment of the requested loan and the performance by Borrower of its other obligations hereunder, Borrower has agreed to provide Lender with certain liens on its business assets, as further set forth herein; and

WHEREAS, Lender is willing to make the requested loan to Borrower on the express terms and conditions of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which Lender and Borrower expressly acknowledge, Lender and Borrower agree as follows:

1.   **Definitions**.  The following terms will have the meaning set forth below for purposes of this Agreement:

   a.   "**Agreement**" has the meaning specified in the Preamble of this Agreement.

   b.   "**Availability Period**" means the period from the date of this Agreement to, but excluding, the Maturity Date.

   c.   "**Bankruptcy Code**" means Title 11 of the U.S. Code, as amended from time to time.

   d.   "**Bankruptcy Court**" has the meaning specified in the Recitals of this Agreement.

e.      "**Base Rate**" means the pre-default interest rate provided for in Section 7 of this Agreement.

f.      "**Books and Records**" has the meaning specified in Section 9 of this Agreement.

g.      "**Borrower**" has the meaning specified in the Preamble of this Agreement.

h.      "**Borrowing Request**" means a Borrowing Request in the form attached as Exhibit A.

i.      "**Budget**" means the forecasted balance sheets, income statements and cash flow statements of Borrower attached as Exhibit B for the period from May 22, 2017 to August 20, 2017, and any subsequent budgets (as referenced in Section 13.c of this Agreement) that Lender approves in writing.

j.      "**Cash Collateral**" means any cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents held or obtained by Borrower that is subject to a Prior Permitted Lien.

k.      "**Chapter 11 Case**" means the case pending in the Bankruptcy Court with respect to Borrower.

l.      "**Collateral**" means all personal property, real property and other assets of Borrower, whether now owned or hereafter acquired (including any such assets acquired under any trade or fictitious names), and whether leased to or from Borrower, regardless of where located, including:   (i) cash and cash equivalents; (ii) all funds in any account of Borrower; (iii) all accounts and other receivables; (iv) contract rights; (v) instruments, documents, and chattel paper; (vi) machinery; (vii) equipment; (viii) inventory; (ix) work in process; (x) general intangibles; (xi) patents, trademarks, tradenames, copyrights and all other intellectual property; (xii) capital stock; (xiii) investment property; (xiv) commercial tort claims and all other claims and causes of action (excluding actions arising under Chapter 5 of the Bankruptcy Code); (xv) supporting obligations; (xvi) letter of credit rights; (xvii) the proceeds of all claims or causes of action (excluding the proceeds of any actions arising under Chapter 5 of the Bankruptcy Code); (xviii) the Real Property; and (xix) to the extent not covered by the foregoing, Collateral also includes: (A) all other assets or property of Borrower (whether tangible or intangible, real, personal, or mixed); (B) all products and proceeds of each of the foregoing; (C) all accessions to, substitutions of, and replacements for any of the foregoing; (D) all rents, profits, and proceeds of the foregoing; and (E) any and all proceeds of any insurance, indemnity, warranty or guaranty payable to Borrower from time to time with respect to any of the foregoing.

m.      "**Debtor in Possession Account**" means the account described on Exhibit C.

n.      "**Default**" has the meaning set forth in Section 14 of this Agreement.

o.      "**Default Rate**" means a fixed rate *per annum* of ten percent (10%).

p.      "**DIP Financing Orders**" means the Interim Order and the Final Order, as applicable.

q.      "**Event of Default**" means a Default that has not been cured or waived following notice of Default by Lender to Borrower within any time period designated in this Agreement.

r.      "**Final Order**" means a final, non-appealable order of the Bankruptcy Court approving the Loan, in form and substance satisfactory to Lender in Lender's sole and absolute discretion.

s.      "**Indemnified Claims**" has the meaning specified in Section 22 of this Agreement.

t.      "**Indemnified Tax**" means any tax imposed on or with respect to any payment made by or on account of any obligation of Borrower under any Loan Documents, all filing or recording fees or stamps, and similar charges, but will not include any taxes relating to Lender's income, profit, or general business operations.

u.      "**Initial Financing Period**" has the meaning specified in Section 2 of this Agreement.

v.      "**Interim Order**" means the interim order of the Bankruptcy Court approving the Loan in form and substance satisfactory to Lender in Lender's sole and absolute discretion.

w.      "**Lien**" means any mortgage, encumbrance, pledge, hypothecation, security interest, lien (whether statutory or otherwise) of any kind with respect to any asset.

x.      "**Loan**" has the meaning set forth in Section 2 of this Agreement.

y.      "**Loan Documents**" means this Agreement, the DIP Financing Orders, and any other documents, instruments, or agreements executed or delivered in connection with this Agreement regarding the Loan.

z.      "**Lender**" has the meaning specified in the Preamble of this Agreement.

aa.     "**Main Office**" means the main office of Lender, currently located at 500 Minimizer Way SE, Blooming Prairie, Minnesota 55917.

bb.     "**Material Adverse Effect**" means an effect that (whether due to a single event, act, or condition, or multiple events, acts, or conditions) causes or reasonably threatens to cause a material adverse effect on:  (i) the business, results of operations, financial condition, assets, liabilities or prospects of Borrower taken as a whole (other than the commencement of the Chapter 11 Case); (ii) the ability of Borrower to perform its obligations under the Loan Documents; (iii) the rights or remedies of Lender under the Loan Documents; (iv) the validity or enforceability of any of the Loan Documents; (v) the value of the Collateral; or (vi) the perfection or priority of any Liens in favor of Lender pursuant to the Loan Documents.

cc.     "**Maturity Date**" means the earliest of:  (i) forty-five (45) calendar days after the Petition Date if the Bankruptcy Court has not entered the Final Order by such time; (ii) one hundred twenty (120) calendar days after the Petition Date; (iii) the date on which a plan of reorganization for Borrower in form and substance satisfactory to Lender in its sole and absolute discretion becomes effective; (iv) the date on which an Event of Default occurs; or (v) the date on which any "Termination Event" set forth in any DIP Financing Order occurs.

dd.     "**Milestone**" has the meaning set forth in Section 21 of this Agreement.

ee.     "**Notice of Event of Default**" has the meaning specified in Section 15 of this Agreement.

-3-

ff.   "**Obligations**" means all amounts Borrower owes to Lender pursuant to or in connection with any Loan Document, including all principal, interest, fees, expenses, indemnification, and reimbursement obligations, whether direct or indirect, absolute or contingent, liquidated or unliquidated, now owing or hereafter arising.

gg.   "**Permitted Variance**" has the meaning set forth in Section 13.d of this Agreement.

hh.   "**Petition Date**" has the meaning specified in the Recitals of this Agreement.

ii.   "**Prepetition Debt**" means any debt, as defined in 11 U.S.C. Section 101(12), that arose before the Petition Date.

jj.   "**Prior Permitted Liens**" has the meaning set forth in Section 10.d of this Agreement.

kk.   "**Purchase Money Advance**" has the meaning set forth in Section 5 of this Agreement.

ll.   "**Purchase Money Debt**" has the meaning set forth in the Recitals of this Agreement.

mm.   "**Real Property**" means the real property legally described on <u>Exhibit D</u>, together with all improvements, buildings, fixtures and appurtenances located thereon or associated therewith.

nn.   "**Shareholder**" has the meaning specified in the Recitals of this Agreement.

oo.   "**Superpriority DIP Claims**" means all of Lender's claims on account of the Obligations, which claims will be entitled to the benefits of 11 U.S.C. Section 364(c)(1), 364(c)(2), 364(c)(3), and 364(d)(1), subject to the Prior Permitted Liens.

pp.   "**Termination Date**" has the meaning set forth in Section 15 of this Agreement.

qq.   "**UCC**" means the Uniform Commercial Code as set forth in Minnesota Statutes ch. 336; provided, however, that if as a result of mandatory provisions of Law, the Uniform Commercial Code as in effect in any other state governs the perfection, effect of perfection, or rights as a result of perfection of any Lien in favor of Lender, the term also means the Uniform Commercial Code in effect in such other state. Unless otherwise defined in this Agreement, any term used in this Agreement that is defined in the UCC will have the meaning provided in the UCC.

rr.   "**Variance Report**" has the meaning set forth in Section 13.c of this Agreement.

2.   **Loan**. Subject to the terms and conditions of this Agreement, and within the strict limits of the Budget as allowed within the Permitted Variance, Lender agrees to lend to Borrower, from time to time during the Availability Period, such amounts as Borrower may request under this Agreement, not to exceed the total sum of **Three Hundred Twenty-Five Thousand and no/100 Dollars ($325,000.00)** (the "**Loan**"); provided, however, that the total aggregate principal amount of the Loan from the date of this Agreement through and including May 31, 2017 (the "**Initial Financing Period**") will not exceed the sum of **One Hundred Thousand and no/100 Dollars ($100,000.00)**.

3.   **Payment and Re-borrowing**. During the Availability Period, and subject to the limitations in Section 2 of this Agreement, Borrower will be entitled to borrow and prepay the Loan in

accordance with the terms and conditions of this Agreement; provided, however, that Borrower may not borrow any amounts under this Agreement if there is an existing Event of Default, and Borrower may not re-borrow any portion of the Loan that Borrower has repaid.

4.    **Advances**.  Borrower will submit no more than one Borrowing Request per calendar week.  Each Borrowing Request must strictly comply with the Budget, within the Permitted Variance, and the terms of this Agreement.  No Borrowing Request may request an advance beyond the cash needs of Borrower for the week that is the subject of the Borrowing Request.  Borrower will provide Lender with a Borrowing Request on or before 12:00 p.m. CST on each Wednesday during the Availability Period.  The Borrowing Request will, among other things, set forth the anticipated advance Borrower requests for the week beginning on the Monday immediately following the Borrowing Request.  If there is no existing Default, the Borrowing Request complies with this Agreement, and subject to the terms and conditions of the Loan Documents, Lender will make an advance from the Loan, directly to the Debtor in Possession Account, as requested in a Borrowing Request on or before 4:00 p.m. CST on the Friday immediately following Lender's receipt of the Borrowing Request.  Borrower will immediately reimburse Lender for all wire and other bank fees Lender incurs in making each advance.  Interest will accrue on all funds advanced beginning on the date that Lender advances those funds to the Debtor in Possession Account.

5.    **Purchase Money Debt**.  In addition to the advances to be made under Section 4 of this Agreement, Lender will advance to Borrower an amount equal to the aggregate outstanding Purchase Money Debt (the "**Purchase Money Advance**") on or within two (2) business days after the date that is fifteen (15) calendar days after the date the Final Order is entered by the Bankruptcy Court.  Borrower shall use the Purchase Money Advance solely for the purpose of immediately paying the Purchase Money Debt in full.

6.    **Repayment**.  On the Maturity Date, Borrower will repay to the order of Lender, at its Main Office, the principal amount of all outstanding Loans, plus all accrued interest, fees, expenses, and other Obligations then outstanding.

7.    **Interest and Fees**.  Borrower will pay interest on the unpaid principal amount of the Loan at the rate of four and one-half percent (4.5%) *per annum* (the "**Base Rate**") until the outstanding principal balance is paid in full.  Interest will accrue on all unpaid principal of the Loan at the Default Rate from and after an Event of Default until the outstanding principal balance is paid in full.  Interest will be calculated on the basis of a year of 360 days for the actual number of days elapsed.

8.    **Payments**.  All payments due pursuant to any Loan Document will be made in lawful money of the United States, and in immediately available funds.

9.    **Books and Records**.  Lender will record in its books and records all advances, charges, expenses, interest, payments, and other debits or credits pursuant to this the Loan, or the Loan Documents (the "**Books and Records**").  Absent manifest error, the Books and Records will be conclusive evidence of the amount owing pursuant to the Loan, or the Loan Documents.  Borrower waives presentment, notice of dishonor, protest, and any other notice or formality with respect to the Loan or the Loan Documents.

10.    **Conditions to Obligation of Lender**.  Lender's obligation to make the Loan, and to make each advance under the Loan, is conditioned upon the timely satisfaction of each of the following:

a.  **Evidence of Existence**.  Borrower will deliver to Lender certified (as of the date of this Agreement) copies of Borrower's organizational documents, appropriate resolutions authorizing Borrower to enter into the Loan and execute the Loan Documents as required, and incumbency certificates.  Borrower will provide Lender any written evidence Lender requests concerning Borrower's principal places of business, tax identification number, doing business names and all information Lender may require to perfect its interest in the Collateral.

b.  **Execution and Delivery**.  All Loan Documents must be duly executed, acknowledged, and delivered to Lender.

c.  **Authorization**.  Borrower will provide Lender with the evidence Lender requires that Borrower's representatives are authorized to execute and deliver the Loan Documents to Lender.

d.  **Liens and Claims**.  Lender shall have a valid and perfected Lien on, and security interest in, all Collateral on the basis and with the priority set forth in the Interim Order, and that Lien and security interest shall be senior to all other Liens that exist as of the Petition Date; provided, however, that the Liens of Signature Bank, the U.S. Small Business Administration, Ford Motor Credit Company, and the Lien in favor of Lender securing the Purchase Money Debt (the "**Prior Permitted Liens**") shall remain senior to the Liens granted to Lender under this Agreement and the DIP Financing Orders.  Except to the extent the DIP Financing Orders permit the same, Borrower will not suffer or permit any administrative expense claim (as set forth in 11 U.S.C. Section 503), Lien or other claim to arise or continue to the extent such Lien, expense, or claim is *pari passu* with or senior to Lender's claims or Liens.

e.  **Compliance with Budget**.  Borrower will not make any expenditure unless it strictly complies with the Budget within the Permitted Variance.  Borrower will strictly comply with all aspects of the Budget with the exception of any Permitted Variance.

f.  **Absence of Default**.  Lender has no obligation to fund the Loan, advance credit, or make any financial accommodation to Borrower if a Default has occurred and is continuing, or if such funding, advance, or accommodation would cause a Default.

g.  **Fees and Expenses**.  Borrower has paid all fees, charges, payments, or escrows provided for in the Loan Documents.

h.  **Insurance**.  Lender has received valid certificates of in-force insurance in form and amount satisfactory to Lender for all policies Lender requires.

i.  **Motions**.  All motions and other documents to be filed with and submitted to the Bankruptcy Court regarding the Loan, and the Bankruptcy Court's approval thereof, shall be in form and substance satisfactory to Lender in its sole discretion.

j.  **Orders**.  With respect to all advances during the Initial Financing Period, the Bankruptcy Court has entered the Interim Order, in form and substance satisfactory to Lender in its sole discretion.  With respect to all advances after the Initial Financing Period, the Bankruptcy Court has entered the Final Order approving the Loan in form and substance satisfactory to Lender, and the DIP Financing Orders must remain in full force and effect, without modification, at the time of each advance.

k.  **Milestones**.  All applicable Milestones have been fully and timely satisfied or waived (in Lender's sole and absolute discretion).

l.  **Additional Documentation**.  Lender has received any other information, approvals, opinions, signatures, or documents it may reasonably request.

m.  **Borrowing Request**.  Borrower has timely delivered a Borrowing Request to Lender in compliance with Section 4 of this Agreement.

n.  **Representations and Warranties**.  All representations and warranties of Borrower in the Loan Documents remain true and correct.

o.  **Compliance with Law**.  The advance does not violate any Law or order, including any order the Bankruptcy Court has issued.

p.  **Material Adverse Effect**.  No Material Adverse Effect has occurred.

q.  **Budget**.  The advance complies with the Budget within the Permitted Variance in all material respects.

11.  **Indemnified Taxes**.  Borrower will make all payments pursuant to any Loan Document without deduction or withholding for any tax, except as applicable Law requires.  If applicable Law requires Borrower to deduct or withhold any tax from any such payment, Borrower will immediately pay the full amount deducted or withheld to the relevant governmental authority.  If the tax is an Indemnified Tax, then the amount owing pursuant to the applicable Loan Document will increase by the amount so deducted or withheld.

12.  **Representations and Warranties**.  Borrower represents and warrants to Lender as follows:

a.  **Formation, Good Standing, and Due Qualification**.  Borrower is a corporation, duly formed, validly existing, and in good standing under the laws of the State of Minnesota. Borrower is authorized to do business in the State of Minnesota, and, pursuant to 11 U.S.C. Sections 1107 and 1108, has the authority to own its assets and to transact the business in which it is now engaged or in which it proposes to be engaged, subject to the restrictions set forth in the Bankruptcy Code.

b.  **Corporate Power and Authority**.  Subject to the restrictions set forth in the Bankruptcy Code, Borrower has the authority to execute, deliver, and perform its obligations under the Loan Documents.  Borrower has taken the necessary action to authorize the Chapter 11 Case, and to execute, deliver and perform its obligations under the Loan Documents without any further consent or approval other than Bankruptcy Court's entry of the DIP Financing Orders.  The execution, delivery, and performance under the Loan Documents do not (and will not):  (i) violate or contravene any bylaws, agreements, order, law, rule, or regulation; or (ii) result in a breach or default under any agreement to which Borrower is a party.

c.  **Legally Enforceable Agreement**.  Each of the Loan Documents is, or when delivered will be:  (i) legal, valid, and binding obligations of Borrower; and (ii) enforceable against Borrower in accordance with their respective terms.

    d.    **Disclosures and Financial Information Accurate**. All financial information Borrower has given to Lender was when made, and remains, accurate. Borrower has disclosed to Lender all material liabilities (whether fixed or contingent, liquidated or unliquidated, due or yet to mature). No statement of fact that Borrower has made in any Loan Document contains any untrue statement of material fact or fails to disclose a fact necessary to prevent the statements made from being misleading. All information that Borrower will provide to Lender in the future will be true and correct, and will fully disclose all material facts.

    e.    **Location of Collateral**. All of the Collateral is and shall be located either at Borrower's address as disclosed to Lender or at the location set forth in the Schedule of Collateral Locations that Borrower will execute and deliver to Lender upon Lender's written request.

    f.    **Agreements and Representations**. Borrower has not relied on any agreement, promise, or statement from Lender in entering into any Loan Document except to the extent such agreement, promise, or statement is expressly set forth in the subject Loan Document.

    g.    **Lender's Duty**. Lender does not (and will not) have any fiduciary or similar duty to Borrower, Borrower's bankruptcy estate, or to any other person.

    h.    **Lender's Relationship**. Lender's relationship to Borrower is solely that of lender. Lender has not participated, and will not participate, in any type of joint venture or partnership with Borrower. The execution and consummation of the Loan Documents (and transactions contemplated therein) do not, and will not, constitute or amount to a joint venture or partnership.

13.    **Covenants**. Borrower agrees that so long as there are any outstanding Obligations, Borrower will comply with the following:

    a.    **Operation of Business**. Borrower will continue to operate as a debtor in possession of its assets pursuant to 11 U.S.C. Sections 1107 and 1108.

    b.    **Repayment**. Borrower will timely and fully pay to Lender all sums due and owing to Lender when such sums are due and owing. Borrower's obligations under the Loan Documents are absolute according to their terms and are not contingent upon Lender: (i) properly obtaining, perfecting, or maintaining any Lien with respect to any property; (ii) properly obtaining or retaining any payment obligation with respect to any other person or entity; (iii) monitoring the Loan; or (iv) enforcing any other rights Lender may have with respect to any other person or entity or property. Borrower waives any claim or defense it may have now, or may hereafter acquire, that relates to: (1) Lender's failure to exercise any rights Lender may have against any person or entity or property; (2) the manner in which Lender monitors or modifies the Loan; or (3) Lender's release of any person or entity or property that may be responsible for (or available to apply towards) payment of the Loan.

    c.    **Reporting**. Borrower will provide to Lender: (i) its monthly consolidated unaudited financial statements within thirty (30) days after the end of each calendar month, which financial statements the Chief Financial Officer will certify as being true, correct, and accurate; (ii) every four calendar weeks, an updated rolling thirteen (13) week budget, which budget Lender must authorize and approve (in Lender's sole discretion);

-8-

(iii) beginning on the first Thursday at the close of the first full week following the Petition Date, and continuing on each Thursday thereafter, a variance report (the "**Variance Report**") that sets forth Borrower's actual cash receipts and disbursements for the immediately preceding week on a line-item basis (in a form reasonably acceptable to Lender) and describes the variance of each item compared to the Budget in effect for the applicable period on a weekly and cumulative basis, which the Chief Financial Officer of Borrower will certify in writing is true, correct, and accurate; and (iv) notification to Lender of the existence of a Material Adverse Effect within one (1) business day of becoming aware of such Material Adverse Effect.

d.     **Permitted Variance**.  Borrower's use of Loan proceeds shall be in accordance with the Budget and any extension to the Budget, it being understood and agreed that the actual amounts for (i) total receipts may not be less than the Budget amount by twenty-five percent (25%) for any rolling four week period as measured on a bi-weekly basis calculated beginning with the first full calendar week following the Petition Date, and (ii) total disbursements may not be greater than the Budget amount by twenty-five percent (25%) for any rolling four week period as measured on a bi-weekly basis calculated beginning with the first full calendar week following the Petition Date (the foregoing clauses (i) and (ii) are collectively the "**Permitted Variance**"); provided, however, that in no event will the Loan exceed the limitations set forth in Section 2 of this Agreement.

e.     **Other Information**.  Borrower will promptly provide Lender with all other information Lender reasonably requests within two (2) business days after Lender's request, and will allow Lender to inspect the assets, facilities, operations, and Books and Records of Borrower within two (2) business days after Lender's request for the same.  Borrower will make its employees, officers, agents, and retained professionals reasonably available to communicate with Lender upon Lender's request for the same.

f.     **Further Assurances**.  Borrower will execute and deliver to Lender all further documents, financing statements, agreements, mortgages and security agreements, and will take all other action (including filing and recording any mortgages, financing statements, or fixture filings) Lender may reasonably request to:  (i) effectuate the transactions the Loan Documents contemplate; or (ii) perfect, protect, or preserve any Liens that the DIP Financing Orders or other Loan Documents create; provided, however, that Lender shall not take or request that Borrower take any action to impair or terminate a Prior Permitted Lien.

g.     **Use of Loan Proceeds**.  Neither Borrower, nor any subsequent trustee or creditors committee, nor any other person may use any proceeds of the Loan or any proceeds of any Collateral to:  (i) seek authorization to obtain Liens that are on parity with, or senior to, the Liens in favor of Lender; (ii) to investigate or prosecute any claim, defense or objection that challenges the rights of Lender, or request any remedy or relief against or adverse to Lender (or any employee, officer, agent, affiliate, or director of Lender). Borrower will not permit any subsidiary or affiliate to use, directly or indirectly, the proceeds of the Loan; provided, however, that Shareholder may use proceeds of the Loan solely within the terms of the Budget subject to the Permitted Variance.

h.     **Modification of DIP Financing Orders**.  Borrower will not:  (i) seek, support, consent to, or suffer to exist any modification or termination of any of the DIP Financing Orders without the prior written consent of Lender; (ii) apply to the Bankruptcy Court for

-9-

authority to take any action that this Agreement or the Loan Documents prohibit without the prior written consent of Lender; or (iii) request authorization to incur, or suffer to exist, any claim other than the claim of Lender that would be entitled to superpriority treatment pursuant to 11 U.S.C. Sections 364(c)(1), 364 (c)(2), 364 (c)(3), or 364(d)(1), other than as expressly provided in this Agreement.

i.      **Prepetition Debts**.  Borrower will not make any payments to creditors on account of any Prepetition Debts without Lender's prior written consent and the Bankruptcy Court's approval.

14.   **Default**.  Any of the following will constitute a Default:

a.      **Payment**.  Borrower fails to pay any Obligation to Lender as and when due and payable;

b.      **Milestones**.  Any Milestone fails to timely occur;

c.      **Representations and Warranties**.  Any representation or warranty Borrower has made, or makes in the future proves to have been incorrect, incomplete, or misleading in any material respect on or as of the date it is made or deemed made, and Borrower does not cure such breach to Lender's satisfaction within five (5) business days after receipt of written notice of such breach by Lender;

d.      **Covenants**.  Borrower fails to perform or observe any other term, covenant, or agreement with Lender, and Borrower does not cure such breach to Lender's satisfaction with five (5) business days after receipt of written notice of such breach by Lender;

e.      **Lender's Rights**.  Any of the Liens, or other rights of Lender in the Collateral at any time are not (or Borrower claims the right is not) a first (super) priority, valid, and perfected interest in the Collateral as set forth in the DIP Financing Orders;

f.      **Other Proceedings**.  Borrower becomes involved in any proceeding that Lender reasonably believes would result in a forfeiture of all or a substantial part of Borrower's assets, or in the entry of a material judgment against Borrower;

g.      **Bankruptcy Matters**.  Any of the following occurs in the Chapter 11 Case:

i.      The Chapter 11 Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or the Bankruptcy Court authorizes the appointment of a trustee or otherwise displaces the debtor as a debtor in possession of its assets pursuant to 11 U.S.C. Sections 1107 and 1108;

ii.     Any party other than Lender obtains relief from the automatic stay imposed pursuant to 11 U.S.C. Section 362(a), or obtains confirmation from the Bankruptcy Court that such automatic stay does not apply;

iii.    Any person files a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code that does not propose to immediately and indefeasibly repay the Obligations in full and in cash;

iv.     Borrower files, supports, or fails to resist any pleading that seeks to vacate or modify any of the DIP Financing Orders without Lender's prior written consent;

-10-

v.      Entry of an order that modifies or amends any of the DIP Financing Orders without Lender's prior written consent;

vi.     Reversal, vacation or stay of any of the DIP Financing Orders;

vii.    Borrower seeks to sell any of its assets outside of the ordinary course of business without Lender's prior written consent;

viii.   Appointment of a responsible officer or examiner with enlarged powers relating to the business operations of Borrower without Lender's prior written consent;

ix.     Borrower files, supports, or fails to resist a motion that seeks an order granting any claim or Lien (except in favor of Lender) that is senior to, or *pari passu* with, Lender's claims and rights, or any court enters such an order;

x.      Except as provided in this Agreement or the DIP Financing Orders or any other court order, Borrower pays, or is authorized to pay or provide, any adequate protection with respect to any Prepetition Debt;

xi.     Borrower loses its exclusive right to file a plan of reorganization pursuant to 11 U.S.C. Section 1121(b), or that right is modified;

xii.    Unless otherwise provided in the Interim Order or the Final Order, or upon Lender's prior written consent, Borrower seeks (or the Bankruptcy Court authorizes) an order pursuant to 11 U.S.C. Section 365 authorizing Borrower to reject a material lease that is part of (or whose premises contains any of) the Collateral; and

xiii.   The Bankruptcy Court fails to authorize (or terminates the authorization of) Borrower to use cash collateral as contemplated in the Budget.

15.     **Remedies upon Event of Default**.  If an Event of Default occurs, all Obligations will become immediately due and owing in full.  Lender may thereafter, in its sole and absolute discretion, file with the Bankruptcy Court an expedited motion for relief from the automatic stay provisions of 11 U.S.C. Section 362, to be heard by the Bankruptcy Court not more than three (3) business days' after such expedited motion is filed, to permit Lender to exercise all rights and remedies set forth in any of the Loan Documents.  Borrower may assert any defenses that it may have or allege it has at the hearing on such expedited motion, other than any defenses to Lender's request for expedited relief.  Upon the entry of a Bankruptcy Court Order granting Lender's requested relief from the automatic stay (the "**Termination Date**"), Lender may also (in its sole and absolute discretion) take any of the following actions without further notice, and without further order from, or application to, the Bankruptcy Court:

a.      **Terminate Commitment**.  Terminate any obligation to make any further advances or financial accommodations to Borrower;

b.      **Collateral**.  Enforce all rights against any Collateral in the possession of Lender, including disposing of the Collateral solely for application towards the Obligations; and/or

-11-

    c.    **Other Action**.  Take any other action, or enforce any other right or remedy, provided by any applicable law or the Loan Documents.

16.    **Borrower Cooperation**.  Upon the receipt of the Notice of Event of Default, Borrower will fully cooperate with Lender in the exercise of Lender's rights and remedies.  Borrower waives any right to seek relief under the Bankruptcy Code (including 11 U.S.C. Section 105) to the extent the relief would restrict or impair Lender's rights and remedies under the DIP Financing Orders or the Loan Documents.

17.    **Bankruptcy Matters**.

    a.    **Superpriority**.  Except as otherwise provided herein, Borrower agrees that the Obligations will be:  (i) Superpriority DIP Claims having priority over all administrative expense claims and unsecured claims against Borrower now existing or hereafter arising, including all administrative expense claims set forth in 11 U.S.C. Sections 105, 326, 328, 330, 331, 332, 333, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114, or any other provision of the Bankruptcy Code; and (ii) secured pursuant to 11 U.S.C. Sections 364(c)(2) and 364(c)(3), and (with the exception of Prior Permitted Liens) Section 364(d)(1), and to the extent provided in the DIP Financing Orders will not be subject to any claims against the Collateral pursuant to 11 U.S.C. Section 506(c).

    b.    **Orders Control**.  In the event the Interim Order or the Final Order conflicts with any of the Loan Documents, the Interim Order or the Final Order, as the case may be, will control; provided, however, that nothing in this Section 17.b waives or releases any rights or remedies Lender may have in the event the Bankruptcy Court enters any order that does not comply with the terms and conditions of this Agreement.

    c.    **Perfection**.  Notwithstanding anything in this Agreement, or elsewhere, to the contrary:

        i.    Lender's Liens in the Collateral will be valid, enforceable, and perfected (with the priority set forth in this Agreement and the DIP Financing Orders) immediately upon entry of the Interim Order, and will continue to be so valid, perfected, and prior regardless of any non-bankruptcy law, and without regard to the dismissal or conversion to another Chapter of the Bankruptcy Code of the Chapter 11 Case.  Lender will not be required to file or enter any financing statement, mortgage, control agreement, or other document or notice, and will not be required to take possession of any Collateral, in order to obtain or perfect any of its rights (including any Lien or the priority thereof) as granted pursuant to the Loan Documents, or the DIP Financing Orders.  However, Lender may (in its sole discretion), at Borrower's expense, file or enter into any financing statement, mortgage, control agreement, or other document or notice that it desires with respect to any right (including any Lien) that is granted pursuant to the Loan Documents or the DIP Financing Orders.  If Lender elects to enforce its rights pursuant to the preceding sentence, the document or action will be deemed to have occurred as of the date the Bankruptcy Court enters the Interim Order, and Lender's actions will not negate or impair the existence, validity, or priority of this Section 17.c or any other rights in favor of Lender.

        ii.    The Liens, priorities, Superpriority DIP Claims, and other rights and remedies of Lender pursuant to the Loan Documents, including the DIP Financing Orders, will not be modified or impaired by any other extension of credit to Borrower

(whether pursuant to 11 U.S.C. Section 364 or otherwise), or by the dismissal or conversion of the Chapter 11 Case to another Chapter of the Bankruptcy Code, or by any other act or omission unless Lender grants its prior written consent to the same.

18.    **Credit Bid**.  Lender may credit bid any or all of the then-outstanding Obligations against any bid Lender submits to purchase any of the Collateral pursuant to any sale conducted pursuant to the UCC, 11 U.S.C. Section 363, or any plan of reorganization.

19.    **Grant of Security**.  To secure the full and prompt performance of all of the Obligations, effective immediately upon the entry of the Interim Order, pursuant to 11 U.S.C. Sections 361, 362, 364(c)(2), 364(c)(3), and 364(d)(1), Lender is granted a continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition, first (and super) priority security interest in and lien on all Collateral, subject only to the Prior Permitted Liens.  To the extent applicable law allows, Borrower irrevocably authorizes Lender, its counsel and other representatives to at any time (and from time to time) file in the name of Borrower or otherwise all such UCC financing statements, continuation statements or mortgages that Lender may deem necessary or appropriate without further authorization from Borrower or the Bankruptcy Court.

20.    **Fees and Expenses**.  Lender may seek allowance of its fees and expenses as provided for under 11 U.S.C. § 506(b) by filing a motion or through any other procedure permitted under the Bankruptcy Code or any order of the Bankruptcy Court.  Borrower shall not object to such request on any ground other than reasonableness.

21.    **Milestones**.  Unless Lender waives the requirement (in its sole discretion), Borrower will achieve the following milestones (each being a "**Milestone**") in the Chapter 11 Case on or before the dates set forth below (or such later date as Lender may, in its sole discretion, agree):

    a.    **Interim Order**.  On or before May 29, 2017, the Bankruptcy Court will have entered the Interim Order.

    b.    **Final Order**.  On or before June 30, 2017, the Bankruptcy Court will have entered the Final Order.

    c.    **Plan of Reorganization**.  On or before September 1, 2017, the Bankruptcy Court will have entered an order confirming a plan of reorganization for Borrower.

    d.    **Effective Date**.  On or before October 6, 2017, a plan of reorganization for Borrower will have become effective.

22.    **Hold Harmless and Indemnification**.  Lender is not responsible for performing Borrower's obligations with respect to the Collateral.  Borrower will indemnify and hold Lender harmless from all claims, damages, and liabilities (including attorneys' fees and legal expenses) (collectively, "**Indemnified Claims**") in any matter relating to or arising out of any Loan Document, or in any way relating to the Collateral (including those Indemnified Claims involving hazardous materials).  Borrower will promptly provide Lender with written notice of any Indemnified Claim.  Upon Lender's request, Borrower will defend Lender from all Indemnified Claims, and will pay the attorneys' fees, legal expenses and other costs Lender incurs in connection therewith.  Lender may, in its sole discretion, at Borrower's expense, employ Lender's own legal counsel to defend any Indemnified Claims.  Indemnified Claims shall not include any claims, assertions, or actions undertaken by an official committee, patient care

ombudsman or patient privacy ombudsman appointed in the Chapter 11 Case, or by the Office of the U.S. Trustee.

23.   **Power of Attorney**.  Borrower appoints Lender as its attorney-in-fact to endorse its name on all instruments and other documents payable to Borrower.  Lender may perform any action or execute any document that the Loan Documents require Borrower to take or execute.  Lender's exercise of its rights under this Section does not relieve Borrower of any obligation under the Loan Documents.  These powers of attorney are coupled with an interest and are irrevocable.

24.   **Participations**.  Lender may sell or transfer, whether now or later, one or more participation or other interests in the Loan (and the Loan Documents) to an affiliate of Lender.  Lender may provide to such affiliate any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan; provided, however, that such affiliate shall be bound by any existing non-disclosure agreement between Lender and Borrower.  Such affiliate will receive and keep that information in full confidence and will use that information solely for the purpose of determining whether to acquire an interest in the Loan.  Lender shall notify Borrower of an intent to share information with an affiliate.  Lender shall file a notice with the Bankruptcy Court of an intent to assign any portion of the Loan and rights under the Loan Documents to such affiliate.

25.   **Amendments, Modifications, Waiver**.  Any amendment, modification, or waiver of any provision of any Loan Document will be effective only if it is in writing and signed by Lender.  Any such amendment, modification, or waiver will be effective only in the specific instance and for the specific purpose for which given.

26.   **Entire Agreement**.  This Agreement and the Loan Documents constitute the entire agreement between the parties with respect to the Loan.

27.   **Notices**.  All notices, requests, demands, claims, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given (a) at the time of delivery if physically delivered, (b) at the time of transmission if transmitted by email, or (c) one (1) business day after having been transmitted to a third party providing delivery services in the ordinary course of business which guarantees delivery on the next business day after such transmittal (e.g., via Federal Express), all of which notices or other communications shall be addressed to the recipient as follows:

| If to Lender: | If to Borrower: |
|---|---|
| Kruckeberg Industries, LLC | Stinar HG, Inc. |
| 500 Minimizer Way SE | 3255 Sibley Memorial Highway |
| Blooming Prairie, MN 55917 | St. Paul, MN 55121 |
| Attn:  Christopher Thorpe | Attn:  Robert Gregor |
| Email:  cthorpe@minimizer.com | Email:  BGregor@stinar.com |
| | |
| With a copy to: | With a copy to: |
| Gray, Plant, Mooty, Mooty & Bennett, P.A. | Sapientia Law Group |
| 500 IDS Center | Suite 100 |
| 80 South Eighth Street | 120 South Sixth Street |
| Minneapolis, MN  55402 | Minneapolis, MN  55402 |
| Attn:  Phillip Bohl | Attn:  Kenneth Edstrom |

-14-

Email:  phillip.bohl@gpmlaw.com          Email:  kene@sapientialaw.com

28.   **No Waiver**.  No failure or delay on the part of Lender (whether by express waiver or otherwise) in exercising any right, power, or remedy under any Loan Document, will impair or waive Lender's right to thereafter insist on strict compliance with the terms of such agreement or to exercise any other right, power or remedy thereunder.  Lender's rights under the Loan Documents are cumulative, and are not exclusive of any other rights, powers, or remedies Lender may now or hereafter have.

29.   **Successors and Assigns**.  This Agreement is binding upon and inures to the benefit of Borrower and Lender and their respective successors and assigns; provided, however, that Borrower may not assign or transfer any of its rights under any Loan Document without prior written consent from Lender, and in no event will any trustee or successor to Borrower's interests or Borrower's status as debtor in possession be entitled to an extension of credit pursuant to the Loan Documents.

30.   **Attorneys' Fees**.  Borrower will reimburse Lender for all costs and expenses (including all attorneys' fees) Lender incurs in protecting or enforcing its rights under the Loan Documents.

31.   **Governing Law**.  The Loan Documents will be interpreted, construed, and enforced pursuant to the federal laws of the United States and the laws of the State of Minnesota without giving effect to the choice of law rules thereof.

32.   **Severability of Provisions**.  Any provision of any Loan Document that is unenforceable in any jurisdiction will, as to such jurisdiction, be ineffective to the extent of such unenforceability without invalidating the remaining provisions or affecting the validity or enforceability of such provision in any other jurisdiction.

33.   **Time of the Essence**.  Time is of the essence to Borrower's obligations under the Loan Documents.

34.   **Headings**.  The headings of the Loan Documents are for the convenience of reference, will not be used to interpret or construe the Loan Documents, and are not a part of the Loan Documents for any purpose.

35.   **Interpretation**.  When a reference is made in this Agreement to a Section or Exhibit, such reference is to a Section or Exhibit of this Agreement unless otherwise indicated.  All words used in this Agreement will be construed to be of such gender or number as the circumstances require.  Any capitalized terms used in any Exhibit but not otherwise defined therein shall have the meaning as defined in this Agreement.  All Exhibits annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth herein.  The word "including" and words of similar import when used in this Agreement will mean "including, without limitation," unless otherwise specified.  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to the Agreement as a whole and not to any particular provision in this Agreement.  The term "or" is not exclusive.  The word "will" shall be construed to have the same meaning and effect as the word "shall."

36.   **Venue; Jurisdiction; Service of Process**.  Any litigation arising out of or relating to this Agreement or the Loan Documents will be brought in the Bankruptcy Court or a court located in Hennepin or Ramsey County, Minnesota.  Borrower consents to the jurisdiction of any such court.  The parties each waive personal service of process in any litigation arising out of or

relating to any of the Loan Documents, and agree that all such service of process may be made in the manner set forth for notices in Section 27 of this Agreement, and that service so made will be deemed completed when deemed delivered under Section 27 of this Agreement.  The parties expressly waive any other requirements of notice or personal service that any applicable law, regulation, or rule may require.

37.    **Jury Trial Waiver**.   LENDER AND BORROWER WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM, OR COUNTERCLAIM, WHETHER IN CONTRACT OR TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THE LOAN DOCUMENTS.

[Signature page immediately follows.]

Agreed to this ___ day of May 2017:


Stinar HG, Inc., a Minnesota corporation

By: _____

Its: _____President & CEO_____




_____


By: _____

Its: _____








*[Signature page to Debtor-in-Possession Loan Agreement]*

-16-

Agreed to this 22nd day of May, 2017:


Stinar HG, Inc.

By: _____

Its: _____



Kruckeberg Industries, LLC

By: _____

Its: _____Chief Financial Officer_____




*[Signature page to Debtor-in-Possession Loan Agreement]*

-17-

Exhibit A

Borrowing Request

_____, 2017

This Borrowing Request is being delivered pursuant to that certain Debtor-in-Possession Loan Agreement dated as of May 22, 2017 (as the same may be amended, restated or otherwise modified from time to time, the "Loan Agreement"), by and between Stinar HG, Inc., a Minnesota corporation ("Borrower"), and Kruckeberg Industries, LLC, a Delaware limited liability company ("Lender").  Unless otherwise defined herein, capitalized terms used herein shall have the meanings set forth in the Loan Agreement.

The undersigned hereby certifies to Lender, as of the date of this Borrowing Request, as follows:

1.      Borrower hereby requests an advance under the Loan in the amount of $_____ (the "Advance"), in accordance with Section 4 of the Loan Agreement, to be made on Monday, _____, 2017, which is a business day.

2.      The proceeds of the Advance will be used for Borrower's working capital purposes in accordance with the Budget within any applicable Permitted Variance.

3.      Both prior to and after giving effect to the Advance, no Default or Event of Default has occurred or is continuing, and the representations and warranties contained in the Loan Agreement are true and correct on the date hereof.

Stinar HG, Inc.

By: _____

Its: _____

-18-

Exhibit B

Budget

# Cash Flow (13 Week)

**Stinar Inc**

| | Pre-Startup EST | 5/22/2017 | 5/29/2017 | 6/5/2017 | 6/12/2017 | 6/19/2017 | 6/26/2017 | 7/3/2017 | 7/10/2017 | 7/17/2017 | 7/24/2017 | 7/31/2017 | 8/7/2017 | 8/14/2017 | Total Item EST |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cash on Hand | | 0 | 134,816 | 120,066 | 38,103 | 124,558 | 108,414 | 93,344 | 23,267 | 36,121 | 27,399 | 25,049 | 78,954 | 300,921 | 380,014 |
| **CASH RECEIPTS** | | | | | | | | | | | | | | | |
| Stinar Product Sales | | 75,862 | 0 | 143,761 | 98,055 | 0 | 32,780 | 198,979 | 107,376 | 91,750 | 0 | 89,955 | 250,688 | 122,993 | 1,212,198 |
| Spare Parts | | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 130,000 |
| DIP Financing | | 150,000 | | | | 100,000 | | | | 70,000 | | | | | 320,000 |
| **TOTAL CASH RECEIPTS** | 0 | 235,862 | 10,000 | 153,761 | 108,055 | 110,000 | 42,780 | 208,979 | 117,376 | 171,750 | 10,000 | 99,955 | 260,688 | 132,993 | 1,662,198 |
| **Total Cash Available (before cash out)** | 0 | 235,862 | 144,816 | 273,827 | 146,158 | 234,558 | 151,194 | 302,323 | 140,643 | 207,871 | 37,399 | 125,004 | 339,641 | 433,914 | 2,773,209 |
| **CASH PAID OUT** | | | | | | | | | | | | | | | |
| Purchases (Stinar COGS) | | 48,896 | 18,500 | 171,294 | 15,000 | 78,094 | 47,500 | 214,627 | 97,922 | 64,422 | 0 | 0 | 14,090 | 0 | 770,344 |
| Purchases (spare parts COGS) | | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 78,000 |
| Gross wages (exact withdrawal) | | 25,000 | 0 | 25,000 | 0 | 25,000 | 0 | 25,000 | 0 | 25,000 | 0 | 25,000 | 0 | 32,500 | 182,500 |
| Payroll expenses (taxes, etc.) | | 10,000 | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 | 0 | 10,000 | 70,000 |
| Outside services | | 4,800 | 0 | 4,800 | 0 | 4,800 | 0 | 4,800 | 0 | 4,800 | 0 | 4,800 | 0 | 4,800 | 33,600 |
| Supplies (office & oper.) | | 0 | 0 | 350 | 0 | 0 | 0 | 350 | 0 | 0 | 0 | 0 | 350 | 0 | 1,050 |
| Repairs & maintenance | | 0 | 0 | 200 | 0 | 0 | 0 | 200 | 0 | 0 | 0 | 0 | 200 | 0 | 600 |
| Advertising | | | | | | | | | | | | | | | 0 |
| Car, delivery & travel | | | | | | | | | | | | | | | 0 |
| Accounting & legal | | | | | | | | | | | | | | | 0 |
| Rent | | | | | | | | | | | | | | | 0 |
| Telephone | | 0 | 0 | 450 | 0 | 0 | 0 | 450 | 0 | 0 | 0 | 0 | 450 | 0 | 1,350 |
| Utilities | | 0 | 0 | 6,000 | 0 | 0 | 0 | 6,000 | 0 | 0 | 0 | 0 | 6,000 | 0 | 18,000 |
| Insurance | | 6,100 | 0 | 2,280 | 0 | 2,000 | 4,100 | 2,280 | 0 | 0 | 6,100 | 0 | 2,280 | 0 | 25,140 |
| Taxes / Fees (real estate, etc.) | | | | | | | | | | | | | | | 0 |
| Interest | | | | | | | | | | | | | | | 0 |
| Other (Sanitation / Removal) | | 0 | 0 | 0 | 350 | 0 | 0 | 0 | 350 | 0 | 0 | 0 | 0 | 350 | 1,050 |
| Other (CC Mach. & Fee) | | 0 | 0 | 1,100 | 0 | 0 | 0 | 1,100 | 0 | 0 | 0 | 0 | 1,100 | 0 | 3,300 |
| Other (specify) | | | | | | | | | | | | 70,000 | | | 70,000 |
| Miscellaneous | | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 3,250 |
| **SUBTOTAL** | 0 | 101,046 | 24,750 | 227,724 | 21,600 | 126,144 | 57,850 | 271,057 | 104,522 | 180,472 | 12,350 | 46,050 | 30,720 | 53,900 | 1,258,184 |
| Adequate Protection Payments | | | | 8,000 | | | | 8,000 | | | | | 8,000 | | 24,000 |
| Capital purchase (specify) | | | | | | | | | | | | | | | 0 |
| Other startup costs | | | | | | | | | | | | | | | 0 |
| Reserve and/or Escrow | | | | | | | | | | | | | | | 0 |
| Owners' Withdrawal | | | | | | | | | | | | | | | 0 |
| **TOTAL CASH PAID OUT** | 0 | 101,046 | 24,750 | 235,724 | 21,600 | 126,144 | 57,850 | 279,057 | 104,522 | 180,472 | 12,350 | 46,050 | 38,720 | 53,900 | 1,282,184 |
| **Cash Position** | 0 | 134,816 | 120,066 | 38,103 | 124,558 | 108,414 | 93,344 | 23,267 | 36,121 | 27,399 | 25,049 | 78,954 | 300,921 | 380,014 | 1,491,025 |

Exhibit C

Debtor in Possession Account

Exhibit D

Real Property

The "Real Property" as defined in the Agreement and more specifically described as:

Lot Four (4) and Lot Five (5), Block Two (2) in Sibley Terminal Industrial Park, according to the recorded plat thereof now on file and of record in the office of the Register of Deeds of Dakota County, Minnesota.
Being Registered land as is evidenced by Certificate of Title No. 145094.

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

---------------------------------------------------

In re:                                                    Bankruptcy No. 17-31670
                                                          Chapter 11 Case
Stinar HG, Inc. d/b/a Stinar Corporation

                                                          Debtor.
---------------------------------------------------

## MEMORANDUM IN SUPPORT OF MOTION FOR APPROVAL OF POST-PETITION SECURED FINANCING AND FOR EXPEDITED RELIEF

## INTRODUCTION

Stinar HG, Inc. the above-referenced debtor (the "Debtor"), by and through its attorneys, submits this memorandum of law in support of its motion for expedited relief and for an order authorizing the approval of Post-Petition Secured Financing.

Section 363 of the Bankruptcy Code prohibits a debtor from using, selling or leasing property, except in the ordinary course of business, unless a court order approving the transaction is obtained. Such an order can be entered if the Debtor offers a reasonable business purpose for the transaction. What follows is a factual description of the transaction contemplated by the Debtor, followed by the legal basis and analysis supporting the approval of this motion.

# FACTS

## Background

The petition commencing this Chapter 11 case was filed on May 22, 2017 (the "Filing Date"), and the case is now pending as a Chapter 11 proceeding before this court. The only secured creditor that Debtor admits an interest in the Debtor's cash collateral is Signature Bank. Debtor is seeking approval of the use of Cash Collateral on an Interim Basis through a motion filed as an additional First Day motion. The amount of nitial cash collateral secured by the Bank is estimated at $1,096,000. The Debtor seeks to recognize the prior priority of the Bank as a Secured Creditor (along with the security interest and mortgage of the Small Business Administration in certain of the Debtor's non-cash assets) as to the Debtor's Initial Cash Collateral. Debtor will establish a Debtor in Possession account and keep all funds from the DIP loan contemplated by the motion in said account.

## History of the Debtor

The late Frank Stinar founded Stinar HG, Inc., d/b/a The Stinar Corporation ("Stinar") in 1946. Stinar is a Minnesota based company with a long standing reputation for reliable, high quality, custom, and cost-effective ground support equipment for the airline industry. Stinar has operated throughout the world via a

11

combination of direct sales representation and company authorized agents. The

company's corporate headquarters and its 40,000 square foot manufacturing

facility are in Eagan, Minnesota. Stinar's sales for the past several years have been

in the $5,000,000 range. Stinar has operated at a loss for several years.

On June 29, 1998, Oakridge Holdings, a publicly held Minnesota-based company,

became the new owner of Stinar. Leading the management team as President of

Stinar Corporation, is C.E.O. Robert Harvey and Vice President of Sales and

Marketing, Robert Gregor. Currently, Stinar is the only asset of Oakridge

Holdings.  Oakridge Holdings has approximately 1,500 shareholders holding

approximately 1,400,000 shares.  The two largest shareholders of Oakridge

Holdings are Robert Harvey who holds approximately 21% of the outstanding

shares and Robert Gregor who holds approximately 10% of the outstanding shares.

The stock of Oakridge is not listed on any exchange and the stock has few trades in

the marketplace.  The best information that the company has is that Oakridge's

stock recently traded at about two cents per share.

Stinar's only business is the manufacturing of ground support equipment for the

aviation industry. Stinar's products are  used to load, service, and maintain all types

of aircraft for both government and commercial applications.  Some of the

equipment Stinar manufactures are:

- ◦ Lavatory Service Carts and Trucks
- ◦ Potable Water Carts and Trucks

- ◦ Passenger Stairways, truck mounted and towable

- ◦ Maintenance High Lifts

- ◦ Disabled Passenger Transporters
- ◦ Flight Line Tow Trucks
- ◦ Refrigerated Catering Carts
- ◦ High Lift Catering Trucks
- ◦ Waste Drain Carts

Stinar builds products to meet specific customer needs. Many of Stinar's

competitors, who offer only standard products to the marketplace, force their

customers to modify operations to fit the products that are available. Stinar's goal

is just the opposite. If a customer has a unique requirement, Stinar strives to

provide them with a cost-effective solution. Stinar strives to make products that are

reliable, designed for efficiency, simple and safe to operate, and are versatile for

multi-use applications.


A.      **The Need for Bankruptcy Relief**

When Stinar was acquired by Oakridge in 1998, international business comprised a

third of its business. In 2010, it dropped to 14%. In 2016 it represented 1% of their

business. The drop is attributed to a variety of issues. Stinar has not been able to

replace this international business with U.S. customers or sales.

In addition, the recently imposed sequestration on purchases by the United States

government has had a major impact on Stinar's government business. The

percentage of government business for the past 8 years is as follows

2010, 65%
2011, 73%
2012, 66%
2013, 70%
2014, 42%
2015, 18%
2016, 7%
2017, 8%

Oakridge employed three different Auditors in the past two year. This grossly

delayed the SEC Filings and hence Oakridge became delinquent on those filings.

This caused a default in Stinar's agreement with its primary lender, Signature

Bank.  Signature Bank was unwilling to re-negotiate the terms of the three loans it

has with the Company and the bank increased Stinar's interest rate on all its loans

to 10% per year which has had a considerable impact on Stinar's ability to use its

cash to purchase inventory and parts to meets its sales orders.

     C.    Reorganization goals:

In August of 2016, Stinar entered into two agreements with with Kruckeberg

Industries ("Kruckeberg"), a Blooming Prairie, Minnesota based injection molding

and industrial manufacturer. The agreements were a long-term management agreement and an agreement to sell all of Stinar's assets to Kruckeberg. Based on the status of Stinar's parent corporation as a publicly traded company, Oakridge received advice that they would need to have a shareholder vote to dispose of the assets of Stinar.  Stinar believed and still believes that it would be impossible to obtain the vote of a majority of its shareholders for the sale of the assets of Stinar as the shares of Oakridge were originally issued in 1961 and there is little trading in the company. Oakridge believes many of the shareholders on the company's shareholder list are either deceased, aged or cannot be found. The two companies therefore chose to enter into a Chapter 11 Reorganization filing to provide an exit strategy for the investors through either a reorganization or a sale of Stinar's assets, provide cash flow support for the company's operations, restructure Stinar's secured debt and eliminate the significant expenses inherent in being a publically traded company, expenses that Stinar, as the only operating entity of Oakridge, is forced to pay.

**Terms of the Proposed Agreement**

The terms of the proposed secured financing agreement are fully set forth in the Debtor's Notice of Motion that accompanies this memorandum.

**Reason for Seeking Post-Petition Financing**

15

The Debtor is unable to obtain financing in the form of unsecured credit and needs to provide the DIP lender with the superpriority administrative expense priority pursuant to section 364(c)(l) of the Bankruptcy Code; and other than the financing from the DIP Lender pursuant to the DIP Agreement, the Debtor has as yet been unable to obtain financing in the form of credit secured by liens on property of the Debtor's estates that is otherwise unencumbered pursuant to section 364(c)(2) of the Bankruptcy Code on terms as favorable as those contained in the DIP Agreement. The relief sought in the Motion is necessary to avoid harm to the Debtor's estate.

The Debtor has requested that the DIP Lender, Kruckeberg Industries, extend it credit, and the DIP Lender is willing to provide such credit upon the terms and conditions set forth in the DIP Loan Agreement..

The Debtor believes that the terms of the financing authorized by the order are fair and reasonable, reflect the Debtor's exercise of prudent business judgment and are supported by reasonably equivalent value and fair consideration.

The DIP Agreement has been negotiated in good faith and at arm's length between the Debtor and the DIP Lender.

## **LEGAL ARGUMENT**

Section 363 of the Bankruptcy Code provides, in pertinent part, as follows:

> (c)  The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate.

The Debtor desires to enter into an agreement with Kruckeberg Industries which will allow the Debtor to operate its business. The standard for approval of such a motion is not a difficult one for the Debtor to achieve. Essentially, this court must apply a business judgment test to the proposal of the Debtor to determine whether the proposed transaction should be approved. If the transaction reflects reasonable business judgment and is otherwise in the best interest of the estate, the transaction should be approved. See, e.g., _Collier on Bankruptcy_, § 363.02[g], and numerous cases cited therein. Where it is in the best interest of the estate and the Debtor to enter into such a transaction, and its terms are reasonable under the circumstances, the proposed transaction should be approved. See _In re Phoenix Steel Corp._, 82 BR 334 (Bky. Del. 1987); WBQ _Partnership v. Commonwealth of Virginia_, 189 BR 97 (Bky. E.D. Va. 1995). The mere fact that someone may disagree with the transaction, or some specific terms relating to the transaction, are not determinative of whether or not the

transaction should be approved.   Rather, it is whether good business judgment has been reasonably exercised under the circumstances that controls.

Here, there can be no question that the transaction proposed to be approved by the Debtor has nothing but a beneficial effect upon the estate and benefits everyone, including the Debtor and creditors of the Debtor.  As a going concern, the Debtor maximizes value for all parties in interest. That is, if the Debtor continues to operate it will obtain a maximum value for creditors by being able to sell its assets to a third party at the highest price possible. By allowing the Debtor to borrow the funds necessary to continue its operations, therefore, the likelihood of reorganization is increased, and the ability of Debtor to increase cash flow and pay its creditors (both secured and unsecured) improves dramatically.

## NEED FOR EXPEDITED NOTICE AND LIMITED NOTICE

The reason for the request for expedited hearing is that Debtor requires the immediate use of the loaned funds to obtain the necessary trucks, inventory and equipment to maintain its business.  Debtor has been unable to operate normally based on a lack of operating capital and has been unable to find a lender to assist it. Inability to pay expenses such as insurance, payroll, and payroll taxes would also lead to disruption of its operations that would cause irreparable damage to the Debtor.

18

Rule 2002(a)(2) of the Fed. R. Bankr. Pro. Provides in relevant part:

> "Except as provided in subdivisions (h), (i), and (l) of this rule, the clerk, or some other person as the court may direct, shall give the debtor, the trustee, all creditors and indenture trustees at least 20 days' notice by mail of: ...
>
> (2) a proposed use, sale, or lease of property of the estate other than in the ordinary course of business, unless the court for cause shown shortens the time or directs another method of giving notice ... "

The Debtor requests that the provision of this motion's notice to the list of creditors and parties in interest as set forth in Local Rule 9013-2 be deemed sufficient for the purposes of this motion.  Based on the limited time available, the inability to quickly notify all of the creditors and the catastrophic nature of the inability of the Debtor to go forward with its business without the financing contemplated by the DIP Loan Agreement, such a request should be granted in the Court's discretion.

## CONCLUSION

The Debtor respectfully requests that this court approve the transaction of allowing the Debtor to enter into a post-petition lending agreement with Kruckeberg Industrie. under the terms and conditions listed in the Exhibits to Debtor's motion. Such a transaction is in the best interest of the Debtor and the creditors and should be approved on an expedited basis.

Respectfully submitted,

Dated: May 22, 2017

/e/  *Kenneth C. Edstrom*

Kenneth C. Edstrom (148696)
Sapientia Law Group
120 South Sixth Street, Suite 100
Minneapolis, MN  55415
612-756-7108
kene@sapientialaw.com

*Proposed Attorneys for Debtor*

## VERIFICATION

I, Robert Harvey, the President of both Debtors, the movant named in the foregoing documents, declare under penalty of perjury that I have read the Notice of Hearing and Motion, and the memorandum of Law in support of said motion and further declare under penalty of perjury that the facts contained therein are true and correct to the best of my knowledge, information and belief.

Dated: _May 22- 2017_

_____
Robert Harvey President Oakridge Holdings, Inc.

Dated: _May 22 2017_

_____
Robert Harvey, President
Stinar HG, Inc., db/a Stinar Corp.

# UNSWORN DECLARATION OF SERVICE

Under penalty of perjury, I declare that on May 22, 2017, in connection with the matter below, the following document(s) were served on the party(s) listed below in the manners indicated:

1.    Notice of Hearing and Motion for Approval of Post-Petition Debtor in Possession Financing Agreement including Provision of Security Interests and Superpriority Administrative Expense Treatment and for Expedited and Limited Notice;
2.    Memorandum of Law in Support of Motion;
3.    Proposed Order; and
4.    Certificate of Service.

by **U.S. MAIL,** by enclosing a copy thereof in an envelope, postage prepaid, and by depositing the same in the post office at Minneapolis, Minnesota directed to the party(s) as indicated below:

SEE ATTACHED SERVICE LIST

via **ECF/MAIL NOTIFICATION,** to the US Trustee and other filers entitle to such notice.

and/or by **FACSIMILE**, as indicated on the attached Service List.

/e/  *Kenneth C. Edstrom*
Kenneth C. Edstrom

Chapter 11 Bky. Case No. _____

# SERVICE LIST

STINAR HG, INC. D/B/A STINAR CORPORATION

Chapter 11 Bky. Case No. 17-31670

RULE 9013-3 SERVICE LIST

| **DEBTOR'S COUNSEL** | **DISTRICT DIRECTOR OF THE INTERNAL REVENUE SERVICE** | **UNITED STATES ATTORNEY FOR THE DISTRICT OF MINNESOTA** |
|---|---|---|
| **Kenneth C. Edstrom**<br>Sapientia Law Group PLLC<br>120 South Sixth Street, Suite 100<br>Minneapolis, MN  55402<br>Phone: 612-756-7108<br>Email: kene@sapientialw.com<br>**VIA ECF** | Internal Revenue Service<br>Wells Fargo Place<br>30 E. 7th St., Mail Stop 5700<br>St. Paul, MN  55101<br>Fax: 651-312-7970<br>**VIA FACSIMILE** | US Attorney<br>600 US Courthouse<br>300 South Fourth Street<br>Minneapolis, MN  55415<br>Fax:  612-664-5788<br>**VIA FACSIMILE** |
| **UNITED STATES TRUSTEE** | **INTERNAL REVENUE SERVICE CENTRALIZED INSOLVENCY OPERATION** | **REQUESTS FOR NOTICE/NOTICE OF APPEARANCE** |
| Sarah Wencil<br>US Trustee<br>1015 US Courthouse<br>300 South 4th Street<br>Minneapolis, MN  55415<br>Email: sarah.j.wencil@usdoj.gov<br>ustpregion12.mn.ecf@usdoj.gov<br>**VIA ECF** | IRS Centralized Insolvency Operation<br>P.O. Box 7346<br>Philadelphia, PA  19101-7346<br>Fax:  267-941-1015<br>**VIA FACSIMILE** | None. |
| **DISTRICT COUNSEL OF THE INTERNAL REVENUE SERVICE** | **COLLECTION DIVISION OF THE MINNESOTA DEPARTMENT OF REVENUE** | |
| IRS District Counsel<br>650 Galtier Plaza<br>380 Jackson Street<br>St. Paul, MN  55101<br>Fax:  651-726-7360<br>**VIA FACSIMILE** | Minnesota Department of Revenue<br>Collection Enforcement<br>551 Bankruptcy Section<br>600 North Robert Street<br>P.O. Box 64447<br>St. Paul, MN  55101<br>Fax:  651-282-2817 | |

|  | **VIA FACSIMILE** |  |
|---|---|---|
| DEBTOR:<br>STINAR CORPORATION<br>Attn: Robert Gregor<br>3225 Sibley Memorial Highway<br>St. Paul, MN 55121<br>Email: bgregor@stinar.com<br>**VIA FACSIMILE/EMAIL** |  |  |

| TOP 10 UNSECURED CREDITORS-All Served VIA Fax or Email with copy by mail if an email address is noted or by US Mail if no Fax or Email is noted | | |
|---|---|---|
| Garelick Steel Co., Inc.<br>Attn: Kim Bliese<br>1900 North 2nd Street<br>Minneapolis, MN 55411<br>Fax: 612-521-9553<br>kim@garelicksteel.com | Chase Cardmember Service<br>Account No. XXXX XXXX 1760<br>P. O. Box 15298<br>Wilmington, DE  19850-5298 | FinishMaster, Inc.<br>Attn: Pam Aynes<br>1643 Solutions Center<br>Chicago, IL 60677-1006<br>Fax: 317-238-5016<br>aynesp@finishmaster.com |
| American Express<br>Box 0001<br>Los Angeles, CA 90096-8000 | American Express<br>P. O. Box 981531<br>El Paso, TX 79998-1531<br>Acct No. XXXX-XXXXXX-X1008 | Ford Motor Credit Company<br>Attn: Mike Avers<br>Irving Business Center, Dept. C<br>P. O. Box 152496<br>Irving, TX 75015-2496<br>mavers1@ford.com |
| Wells Fargo Business<br>P. O. Box 29482<br>Phoenix, AZ 85038-8650 | Blue Rock Refinishing Solutions<br>Attn: Tom Maslowski<br>2974 Cleveland Avenue North<br>Roseville, MN 55113<br>Fax: 651-621-8892<br>tom.maz@bluerockrs.com | Force America Dist., LLC<br>Attn: Patty Albertson<br>501 E. Cliff Road, Suite #100<br>Burnsville, MN 55337<br>Fax: 952-707-1341<br>palbertson@forceamerica.com |
| Ruff Mfg., Inc.<br>Attn:  Pat<br>21105 Edmonton Avenue<br>Farmington, MN  55024<br>Fax: 651-463-1032<br>ruffmfg@frontiernet.net | | |

| SECURED CREDITORS \-All Served VIA Fax or Email with copy by mail if an email address is noted or by US Mail if no Fax or Email is noted | | |
|---|---|---|
| Signature Bank<br>9800 Bren Rd., Suite 200<br>Eden Prairie, MN 55343<br>Fax: 952 936-7801 | Minneapolis Dist. SBA<br>c/o Royce Nelligan, Counsel<br>330 2nd Ave. So., Suite 430<br>Minneapolis, MN 55402<br>royce.nelligan@sba.gov | Kruckeberg Industries, LLC<br>Attn: Julie Strand<br>500 Minimizer Way SE<br>Blooming Prairie, MN 55917<br>julie@minimizer.com |
| Phil Bohl<br>Gray Plant Law Firm<br>80 South 8th Street, Suite 500<br>Minneapolis, MN 55402<br>phillip.bohl@gpmlaw.com<br>**VIA ECF** | | |

## DISTRICT OF MINNESOTA

---------------------------------------------------

In re:

Stinar HG, Inc. d/b/a Stinar Corporation

Bankruptcy No. 17-31670
Chapter 11 Case

Debtor.

---------------------------------------------------

## FINDINGS OF FACT AND ORDER APPROVING POST-PETITION DEBTOR IN POSSESSION FINANCING AGREEMENT, AND (B) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE TREATMENT

THIS MATTER, having come before the undersigned upon the motion of Stinar, HG, Inc., d/b/a Stinar Corporation (the "Debtor") for approval of post-petition Debtor in Possession financing agreement between the Debtor and Kruckeberg Industries ("Secured Party") and the granting of security interests under Section 364 of the Bankruptcy Code (the "Motion"), and it appearing that the immediate entry of this Order is essential to the continued orderly operation of the Debtor's business and is in the best interest of the Debtor and the Debtor's estate, the following findings of fact are made by the Court:

I.    FINDINGS OF FACT

1.    On May 22, 2017 (the "Petition Date") the Debtor filed its voluntary petition for relief pursuant to Chapter 11 of Title 11 of the United States Code.

4

2.  The Debtor and Secured Party have negotiated the terms of Loan and Security Agreement, a copy of which was attached as Exhibit A to the Debtor's Motion for Debtor in Possession Financing (the "Post-Petition Agreement").

3.  The Post-Petition Agreement provides for advances by Secured Party to the Debtor,

4.  The Debtor, notwithstanding its efforts to do so, is unable to obtain unsecured credit allowable under 11 U.S.C. Section 503(b)(l) as an administrative expense, or other than pursuant to 11 U.S.C. Section 364(c)(2) and (3), and the Debtor is unable to obtain credit on terms equal to or more favorable than those proposed by Secured Party.

5.  Secured Party has agreed to finance a DIP loan accordance with the Post-Petition Agreement in good faith, within the meaning of 11 U.S.C. Section 364(e), and all interested parties were either notified of the Motion, as evidenced by the affidavit of service, or were present at this Court's hearing on the Motion.

6.  The Debtor has provided written notice of the filing of the Motion to Secured Party, the United States Trustee, any Official Creditors' Committee appointed in this Case, if any and its counsel, the ten largest unsecured creditors of the Debtor, all of the Debtor's secured creditors, the Internal Revenue Service, and all parties who filed requests for notice as evidenced by the

5

affidavit of service filed by the Debtor's counsel with this Court, which notice this Court finds to be appropriate and adequate under Federal Rules of Bankruptcy Procedure 2002 and 4001, and as required by Section 364 of the Bankruptcy Code.

7.    The Post-Petition Agreement with Secured Party provides a vital source of working capital for the Debtor, is in the best interests of the Debtor and its estate, and is necessary to avoid immediate and irreparable harm.

8.    The Debtor has sought use of Cash Collateral on an interim and final basis.  The Court has granted the motion for use of Cash Collateral on an interim basis to date. Signature Bank ("Bank.") claims a first secured position in the Debtor's pre-petition cash collateral.  The Order approving the interim use of cash collateral, among other things, provide for an interest in the cash collateral of the Debtor as of the Petition Date in the estimated amount of $1,096,000.00.

II.   ORDER

Based on the foregoing Findings, it is now therefore ORDERED as follows:

1.    All capitalized terms used in this Order, not otherwise defined herein and unless otherwise indicated, shall have the meaning given them in the Post-Petition Agreement.

2.      The Debtor is authorized, effective immediately, to enter into the Post-Petition Agreement with Secured Party pursuant to Bankruptcy Code Section 363 and to execute all documents and take all actions to be executed and taken in connection with and in furtherance of all undertakings and obligations thereunder.

3.      The Debtor is authorized and empowered to incur secured indebtedness to Secured Party pursuant to this Order and the Post-Petition Agreement in such amounts as needed in the ordinary course of its business and not for any purpose prohibited by law.  Debtor's use of the proceeds of such indebtedness shall not affect the rights of Secured Party hereunder.

4.      Secured Party and Debtor may amend, modify, supplement, waive the provisions of and/or extend the term of the agreements contemplated herein without further order of the Court provided that same does not materially alter the provisions thereof.

5.      Pursuant to Section 364(c)(2) and 364(d)(l) of the Bankruptcy Code, the Debtor may grant to Secured Party a security interest in the collateral as set forth in the Post-Petition  Agreement effective as of the date of the filing of the Bankruptcy Case ("Collateral") as collateral for all future obligations of the Debtor to Secured Party, including Secured Party's expenses incurred in connection with the negotiation documentation, closing and enforcement of the

Post-Petition   Agreement and the protection of Secured Party's rights in this Bankruptcy Case (the "Obligations"). The security interest shall be senior to all other liens except those for unassailable validly perfected pre-petition liens or liens previously granted by the Bankruptcy Court in this Chapter 11 proceeding, including the Prior Permitted liens of Security Bank and the Small Business Administration.

6.      The Debtor shall pay to the Secured Party on demand without application to the Court (but subject to review by the Official Committee of Unsecured Creditors, if any, and the U.S. Trustee), Secured Party's reasonable fees arising from or related to the transactions contemplated herein, including without limitation the negotiating, closing, documenting, and obtaining Court approval thereof, the enforcement of Secured Party's rights against Debtor.

7.      The Obligations shall constitute a superpriority administrative expense claim under Section 364(c)(l) of the Bankruptcy Code, which shall be deemed allowed, without any further filing by Secured Party, and which shall have priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code..

8.      To the extent that the Debtor may become indebted to any governmental entity, whether for payroll or other taxes or otherwise, and said governmental entity is also an account debtor of the Debtor, the governmental

8

entity's right of setoff, defense , counterclaim or recoupment, if any, shall be subordinate to the rights of Secured Party with respect to accounts owing to the Debtor which comprise a portion of the Collateral, and the governmental entity shall pay the amount owing on the account free of any claim of setoff or recoupment.

9. The liens and mortgages granted to Secured Party herein are deemed validly granted, duly attached, and properly perfected, without the need of any additional actions being taken by or on behalf of Secured Party, including but not limited to, the filing or recording of Uniform Commercial Code financing statements; provided, however, that in the event Secured Party does make such a filing or recordation, the Debtor shall execute all documents required by Secured Party to do so.

10. Nothing in the Post-Petition Agreement, or in any of the documents executed in connection therewith or this Order, shall give this Court the authority to require Secured Party to purchase accounts from the Debtor, such being in the sole discretion of Secured Party.

11. Secured party is hereby afforded the protection of Section 364(e) of the Bankruptcy Code with regard to the reversal or modification on appeal of this Order, or to the modification, vacating, or other amendment of this Order by this Court.

12.    The Debtor shall comply with all provisions of the Post-Petition Agreement.

13.    To the extent that any provision of the Post-Petition Agreement shall cause the Debtor to be in default thereunder solely as a result of it being subject to the Bankruptcy Code or it being insolvent, said provisions are waived by Secured Party.

14.    The Debtor shall not grant to any party any interest in the Collateral or priority in payment prior to or equal with the lien or priority in payment hereby being accorded to Secured Party.

15.    The entry of this Order and execution, delivery, and performance under the Post-Petition Agreement, or under any other documents executed in connection therewith, do not constitute a compromise, waiver, or other relinquishment of any right of Secured Party at law, in equity or otherwise, including, but not limited to, any right of Secured Party to request and to obtain relief under the Bankruptcy Code.

16.    The Debtor will not seek to surcharge the Secured Party or its collateral with any expenses of the type described in Section 506(c) or 552(b) of the Bankruptcy Code unless it obtained Secured Party's prior written consent to the incurrence of such expenses.

17.    The Post-Petition Agreement is enforceable according to its terms and nothing contained therein is unlawful, unenforceable or violative of any usury or similar statute.

18.    An event of default under this Order ("Default")  shall include the following:

    a. the Debtor's failure to perform or comply with any of the terms, conditions, or covenants of this Order;

    b. The Debtor's failure to perform or comply with any of the terms, conditions, or covenants of the Post-Petition Agreement;

    c. The termination of this Order by its own terms, operation of law or court order;

    d. The dismissal of this Bankruptcy Case;

    e. The appointment of a trustee under the Bankruptcy Code;

    f. The conversion of the Bankruptcy Case to a case under another chapter of the Bankruptcy Code;

Upon the occurrence of a Default, Secured Party shall provide the Debtor written notice of such Default to the Debtor and counsel for the Debtor.  If the Default is a type that is not curable, or is curable by the Debtor and the Debtor fails to cure the Default within three days after notice of default, Secured Party shall have the right to seek whatever relief it deems necessary on an expedited

11

basis.  Debtor shall maintain all rights in said hearing, including the right to prove that despite of any default that the Secured Creditor still is adequately protected.

19.    Notwithstanding anything to the contrary contained herein, the proceeds of any advance from Secured Party, shall be used either: (a) in connection with the investigation, assertion, commencement, or continuation of any action or claim against Secured Party or (b) to object to or contest, or raise any defenses to the validity, perfection, priority, or enforceability of any rights or claims of the Secured Party.

20.    This Order is without prejudice to Secured Party's rights to pursue any and all rights and remedies under the Bankruptcy Code, the Agreement, and any other applicable agreement or law, including without limitation to seek an injunction, and/or to object to applications for allowance and/or payment of compensation of professionals employed by the Debtor or its estate.

BY THE COURT:

Dated: _____      _____
                                   The Honorable Kathleen H. Sanberg
                                   Chief United States Bankruptcy Judge

12